*Decision will be entered under Rule 50.*

PERRY E. BONDY AND HATTIE BONDY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65105. Filed August 13, 1958.

*David H. Wilson, Esq.*, for the petitioners.
*James F. Shea, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined a deficiency in the income tax of petitioners for 1953 in the amount of $211,851.

The sole issue in the case is whether Perry E. Bondy received a dividend in the amount of $268,538.67 upon the distribution of 100 shares of stock in P. E. B. Inc. during the taxable year 1953.

### FINDINGS OF FACT.

Some of the facts were stipulated and they are found accordingly.

Petitioners Perry E. Bondy and Hattie Bondy are husband and wife. They were married June 29, 1953, and at the time of trial they were residents of Toronto, Ontario, Canada. Their joint Federal income tax return for the taxable year 1953 was filed with the district director of internal revenue at Baltimore, Maryland. Hattie Bondy is involved in this case only because she filed a joint income tax return with Perry E. Bondy in 1953.

Perry E. Bondy was married to May B. Bondy on December 14, 1920, and remained married to her until they were divorced in April 1953.

Market Motors, Inc., an Ohio corporation, was organized in 1938 and since that time it has been in business in Akron, Ohio, as a dealer in Ford automobiles. At all times material to this case Perry E. Bondy was the president and sole stockholder of Market Motors, Inc., and at all times material to this case Market Motors, Inc., was engaged primarily in the sale of new and used automobiles in Akron, Ohio, under a Ford Motor Company franchise.

In 1948 Market Motors, Inc., began the erection of a building in which to carry on its business. This building was one of the largest of its type in Ohio. The Ford Motor Company followed a practice of exercising close supervision over its dealers and Ford Motor Company felt that the building Market Motors, Inc., was erecting, on account of its size, was impractical and might endanger the financial success of Market Motors, Inc. The dealer's contract of Market Motors, Inc., with Ford Motor Company was a yearly contract, cancelable at will, or in any event, with no more than 60 days' notice.

Pursuant to the insistence of Ford Motor Company that the building be taken out of the assets of Market Motors, Inc., Bondy Real Estate, Inc., was formed on July 10, 1950, by Market Motors, Inc., and the building and another piece of real estate were transferred to it in return for all of the Bondy Real Estate, Inc., stock (250 shares). Thereafter Market Motors, Inc., leased the building from Bondy Real Estate, Inc. The plan at the time of the formation of Bondy Real Estate, Inc., was to distribute this stock to Bondy but prior to this distribution Market Motors, Inc., and Bondy learned that this would constitute a dividend payment to Bondy, so nothing further was done at this time and the Bondy Real Estate, Inc., stock remained as an asset of Market Motors, Inc.

In the fall of 1952 May B. Bondy commenced an action for divorce against Perry Bondy in the Court of Common Pleas of Summit County, Ohio. There were various conferences between the attorneys representing May and Perry Bondy as to a property settlement between them. Perry Bondy, through his attorneys, refused to consider any property settlement that involved Market Motors, Inc., stock, believing that if May acquired an interest of any sort in Market Motors, Inc., Ford Motor Company would cancel its franchise as a dealer.

In an early conference with May's attorneys, Bondy and his attorney learned for the first time of section 112 (b) (11),[1] which had been enacted on October 20, 1951. After several more conferences amongst the attorneys, a plan was evolved whereby a separation agreement would be executed by Perry and May Bondy, and Market Motors, Inc., would form a new company to be known as P. E. B. Inc., transfer all

---

[1] All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.

of the Bondy Real Estate, Inc., stock, to it in return for all of the P. E. B. Inc. stock, and then distribute all of the P. E.B. Inc. stock to Bondy as sole shareholder of Market Motors, Inc., and then Bondy could use the P. E. B. Inc. stock as security for performance of the separation agreement and in accordance with other provisions of the separation agreement.

In accordance with these plans, the parties, on March 20, 1953, reached preliminary agreement on the terms of a separation agreement.

This separation agreement was, as stated therein, to "settle and determine forever and completely the matter of present and future support for the wife, the right to any and all property, real and personal, and the right to any and all other benefits and privileges conferred, and obligations imposed, on each by virtue of their marriage."

The agreement further provides, as follows:

(1) Husband agrees to pay to the wife for her maintenance and support the sum of One Thousand Dollars ($1000.00) per month, beginning the 1st day of April, 1953 for the month of April and on the first day of each month thereafter,

(a) As long as the wife lives, or

(b) Until the husband conveys and transfers, or causes to be conveyed and transferred, to the wife, as hereinafter provided, three-fifths (⅗ths) of all the issued and outstanding shares of stock of P. E. B. Inc., to have and keep same as her sole property, free and clear of any claim on his part.

(c) Husband represents that he is the sole owner of all the issued and outstanding shares of stock of said P. E. B. Inc., which corporation owns all the issued and outstanding shares of stock of the Bondy Real Estate Inc., and that said Bondy Real Estate Inc. owns 4 parcels of real estate situated in Akron, Ohio, on which there is a present mortgage indebtedness in the sum of about $180,000.00.

(2) At any time when, and only when, said P. E. B. Inc., and its wholly owned subsidiary, the Bondy Real Estate Inc., are free of all mortgage indebtedness the husband may, at his sole option, completely terminate his aforesaid obligation to pay to the wife the $1000.00 each month by conveying and transferring to her three-fifths (⅗ths) of all issued and outstanding shares of stock of said P. E. B. Inc., to have and keep same as her sole property as aforesaid.

(3) However, if the husband offers to convey and transfer to the wife three-fifths (⅗ths) of all said shares at a time when said P. E. B. Inc. and its wholly owned subsidiary, the Bondy Real Estate Inc., are not free of all mortgage indebtedness, the wife shall neither be required nor obligated to accept same in discharge of the husband's aforesaid obligation to pay to her the sum of $1000.00 each month, but nothing herein contained shall be construed to preclude her from so accepting said shares if she so elects at her sole option.

(4) But in any event, so long as said P. E. B. Inc., and its wholly owned subsidiary, the Bondy Real Estate Inc., are not completely free of all mortgage indebtedness, the husband shall neither be permitted to draw, nor to have, any salary, and neither shall he be permitted to receive nor to have any dividends or other moneys directly or indirectly from P. E. B. Inc. or its wholly owned subsidiary, the Bondy Real Estate Inc.; and further, the husband agrees

to diligently promote the interests and conserve the assets of P. E. B. Inc. and its wholly owned subsidiary, the Bondy Real Estate Inc.

(5) To secure complete performance of this agreement on his part, the husband agrees to deposit as collateral security forthwith, or as soon as same are cleared by the Commercial Credit Co., in escrow with The First National Bank of Akron, Ohio, such certificates (duly endorsed by the husband in blank) as represent three-fifths (⅗ths) of all the issued and outstanding shares of stock of said P. E. B. Inc., and such certificate or certificates as represents all the issued and outstanding shares of stock of said Bondy Real Estate Inc., and all said certificates of said corporations and the shares represented thereby, shall remain, and be held, in escrow by said bank until all the requirements of this agreement, and particularly those contained in paragraphs 1 through 8 herein, shall have been fulfilled and completed. And if the husband in his lifetime, for any reason, fails to convey and transfer all said shares to the wife as herein provided, then said First National Bank of Akron, as escrow agent, is hereby authorized, empowered and directed to, and it shall forthwith, upon the death of Perry E. Bondy, deliver to the wife said certificates representing three-fifths (⅗ths) of all said issued shares of stock of said P. E. B. Inc.

It is expressly understood and agreed that said three-fifths (⅗ths) of all the issued and outstanding shares of stock of said P. E. B. Inc. required to be transferred and conveyed to the wife as herein provided is, and constitutes, a property settlement between the spouses.

(6) And, in any event, it is agreed that if the wife survives the husband, she is to unconditionally receive, have and keep all said shares as her sole property, and to secure same, the husband agrees to execute and to maintain in full force and effect his "Last Will and Testament" containing the following provisions:—

"Being obligated to convey and transfer to May B. Bondy under the provisions of a 'Separation Agreement' entered into on March 20, 1953, and also under the final decree and order made by the Common Pleas Court of Summit County, Ohio, in case bearing No. 186439 of the records of said Court, and it further being my desire and request that said May B. Bondy have and keep same as her sole property, I hereby give and bequeath to her three-fifths (⅗ths) of all said issued and outstanding shares of stock of P. E. B. Inc., and I hereby authorize, empower and direct my Executor to forthwith do and perform any and all acts necessary to effect the conveyance and transfer of all said shares to said May B. Bondy.

"And if said May B. Bondy should predecease me, then I give and bequeath said three-fifths (⅗ths) of all the shares of stock of P. E. B. Inc. to my daughters, Jean (married Ditton) and Jane (married Giles) equally."

The agreement goes on to provide that, except as provided in the agreement, neither spouse was to have any interest in the property of the other, and the wife was to have no right in the management of P. E. B. Inc. or Bondy Real Estate, Inc.; each was to pay his or her own attorney's fees; neither was to incur indebtedness on the credit of the other; they were to continue to live apart and paragraph 15 provided:

(15) Except as hereinabove otherwise provided, each party releases and discharges completely and forever the other from any and all rights of present and future support, division of property, right of dower, right to act as administrator or executor in the estate of the other, right of distributive share in the other's

estate, right of exemption in the estate of the other, or any other property rights, benefits, or privileges accruing to either party by virtue of said marriage relationship, whether the same are conferred by the statutory law or the common law of Ohio or of any other State or Country. It is the understanding of said wife and husband that this agreement, except as otherwise provided herein, forever and completely adjusts, settles, disposes of, and completely terminates, any and all rights, claims, privileges and benefits that each now has, or each may have reason to believe each has against the other, arising out of said marriage relationship, whether the same are conferred by the laws of the State of Ohio or of any other State or Country, and which are now, or which may hereafter be, in force and effect.

There was no specific reference in the agreement to the then pending divorce action between the parties but paragraph (18) of the agreement provided:

(18) This agreement is not, and shall not be construed as, a consent to any divorce proceeding now pending or which may hereafter be instituted. If either party hereafter should procure a divorce, then and thereat, this entire agreement shall be presented to the court with the request that it be considered by the court and that, if approved by the court, that it be incorporated in and made a part of the final decree of such proceeding.

At this time all of the stock of Market Motors, Inc., and Bondy Real Estate, Inc., was pledged with Commercial Credit Corporation of Akron, Ohio, for Bondy's personal debt amounting at that time to approximately $37,000, and the stock was physically at the Commercial Credit Corporation's office. Upon being informed of the plan, Commercial Credit Corporation agreed to return this stock held by it for long enough to complete the transfers upon the condition that immediately after the transfers this stock, along with all of the P. E. B. Inc. stock, be returned to it to be held in pledge for Bondy's debt until it had been paid in full. Accordingly, Commercial Credit Corporation returned the Market Motors, Inc., and Bondy Real Estate, Inc., stock to Bondy on April 3, 1953, and on that date the plan was carried out with all of the necessary transfers of stocks and corporate minutes. Immediately thereafter all of the stock involved, including all of the P. E. B. Inc. stock, was returned to Commercial Credit Corporation. The parties then on the same day went to the trust department of the First National Bank of Akron, where the separation agreement tentatively agreed to on March 20, 1953, was executed and delivered, along with a letter signed by Bondy, dated April 3, 1953, and addressed to May wherein it was stated:

By the way of inducing you to execute and deliver the Separation Agreement entered into between us as husband and wife, which agreement is to be made part of the court decree in case bearing No. 186439 of the records of the Common Pleas Court of Summit County, Ohio, I hereby agree and assure you.

1. That I personally will not borrow any moneys or contract any further debts with Commercial Credit Corporation and

2. That as shareholder, director or officer of Bondy Real Estate, Inc., and of P–E–B, Inc., I will not borrow or permit the borrowing of any further moneys or the contracting of any further debt with Commercial Credit Corporation wherein I, or either of said corporations, may be required to deliver as collateral security therefor any shares of either of said corporations, and

3. That upon payment to said Commercial Credit Corporation the sum now due it (approximately $37,000.00) all certificates representing shares of stock of Bondy Real Estate, Inc., and P–E–B, Inc., will thereupon be released and dealt with in accordance with the terms of said Separation Agreement.

(Signed) Perry E. Bondy
PERRY E. BONDY

On April 6, 1953, an uncontested hearing was had in the divorce case, as the result of which May B. Bondy was granted a divorce from Bondy on that day, the court incorporating the separation agreement in its decree.

It was the understanding of all parties that Bondy's loan to Commercial Credit Corporation would be paid off in a few months. It actually was paid off in June of 1953, at which time the stock was placed in escrow pursuant to the terms of the separation agreement.

OPINION.

In this case the parties stipulate:

The fair market value of all the P. E. B. Inc. stock was $268,538.67 immediately after acquisition by it of the Bondy Real Estate, Inc.'s stock, which amount is ordinary dividend income to the petitioners in the taxable year 1953, unless the court determines that petitioners' gains upon stock transactions involved in this proceeding are not recognized under the provisions of section 112 (b) (11) of the Internal Revenue Code of 1939.

Section 112 (b) (11) provides as follows:

SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

\* \* \* \* \* \* \*

(11) DISTRIBUTION OF STOCK NOT IN LIQUIDATION.—If there is distributed, in pursuance of a plan of reorganization, to a shareholder of a corporation which is a party to the reorganization, stock (other than preferred stock) in another corporation which is a party to the reorganization, without the surrender by such shareholder of stock, no gain to the distributee from the receipt of such stock shall be recognized unless it appears that (A) any corporation which is a party to such reorganization was not intended to continue the active conduct of a trade or business after such reorganization, or (B) the corporation whose stock is distributed was used principally as a device for the distribution of earnings and profits to the shareholders of any corporation a party to the reorganization.

The statute contemplates a transfer of assets by one corporation to another "in pursuance of a plan of reorganization" of the corporate business. It must not be, in the words of *Gregory* v. *Helvering*, 293 U. S. 465, "a transfer of assets by one corporation to another in pursuance of a plan having no relation to the business of either." The statute carves out of its tax-free operation the situation where the assets are transferred to a corporation that is "used principally as a device for the distribution of earnings and profits to the shareholders."

. Respondent argues there was a lack of business purpose in the transfer of Bondy Real Estate, Inc., stock to P. E. B. Inc., and, consequently, the transfer was not made "in pursuance of a plan of reorganization." We think he is correct. P. E. B. Inc. was created and used principally, if not entirely, as a device to distribute earnings and profits of Market Motors, Inc., to its sole shareholder, Perry E. Bondy. It was not used and it was not intended to be used for any business purpose of Market Motors, Inc.

In March 1953, Market Motors, Inc., the automobile dealer corporation, owned all of the stock of Bondy Real Estate, Inc. Admittedly, if Bondy Real Estate, Inc., stock were merely transferred to Bondy, the sole shareholder of Market Motors, Inc., the transfer would have resulted in a distribution of earnings and profits to Bondy or dividend income, and therefore, would have been taxable. This was not done and this record plainly shows it was not done *because* it would be a dividend distribution to Bondy. A company was formed for the sole purpose of holding the stock of Bondy Real Estate, Inc., and this company was called P. E. B. Inc. As soon as Market Motors, Inc., placed the Bondy Real Estate, Inc., stock in P. E. B. Inc. in April 1953, it transferred the P. E. B. Inc. stock, it had received in the exchange, to Bondy.

It is perfectly obvious that P. E. B. Inc. was brought into existence and used for no other purpose than to transfer the earnings and profits of Market Motors, Inc., represented by Bondy Real Estate, Inc., stock, to Bondy. Its sole use was that of a container to carry the Bondy Real Estate, Inc., stock to Bondy. The transfer of assets from Market Motors, Inc., to P. E. B. Inc. served no business purpose of Market Motors, Inc.

Petitioner argues the business purpose of Market Motors, Inc., that was served was the preservation of its Ford franchise. This record does establish Ford's insistence that the real estate be separated from the operating business of the dealer company. And we think it establishes that Bondy Real Estate, Inc., was formed and the real estate transferred to it in order to satisfy Ford. We would also hold that yielding to the dictates of Ford in this regard would be serving a business purpose since the company's chief asset was a readily can-

celable yearly Ford franchise. But all of this does not mean any business purpose was served when Market Motors, Inc., created P. E. B. Inc. and transferred its assets, Bondy Real Estate, Inc., stock, to it.

It would seem the separation of the realty into a wholly owned subsidiary would satisfy Ford. But Bondy, the president of Market Motors, Inc., and Bierce, its secretary, testified Allen, Ford's representative, continued his insistence that they get the real estate out of Market Motors, Inc. They said the insistence continued on after the realty had been transferred to Bondy Real Estate, Inc. We have made no finding of fact that this insistence continued after 1950 (and we can say this part of the testimony is not strong) but were we to agree there was continuance of this insistence, meaning Ford was urging Market Motors, Inc., to get rid of Bondy Real Estate, Inc., stock, it would not amount to the requisite business purpose in the transfer of Bondy Real Estate, Inc., stock to P. E. B. Inc. Transferring all of the stock in a wholly owned subsidiary to another newly created subsidiary is not getting rid of it. If the insistence continued, the business purpose of yielding to it would have been accomplished by transferring Bondy Real Estate, Inc., stock to Bondy as a dividend. It served no business purpose to transfer it to P. E. B. Inc.

We need not go into the arguments advanced by petitioner that other requisites of a reorganization were present, such as control of the transferee corporation by the transferor corporation or its shareholder "immediately after the transfer" (sec. 112 (g) (1) (D)) and ownership of stock possessing the required voting power as provided in section 112 (h). Admittedly the plan followed the form of a corporate reorganization but it was not a plan to reorganize a business at all. It was, as was the plan in *Gregory* v. *Helvering*, *supra*, a plan "to transfer a parcel of corporate shares to the petitioner."

We hold for respondent. Due to some other conceded issues,

*Decision will be entered under Rule 50.*