**Edythe L. WILKINS, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. P–2248.**

United States District Court
S. D. Illinois, N. D.

Oct. 20, 1960.

Davis, Morgan & Witherell, Peoria, Ill., for plaintiff.

Harlington Wood, Jr., U. S. Atty., Springfield, Ill., for defendant.

MERCER, Chief Judge.

Plaintiff, Edythe L. Wilkins, prosecutes this suit against the United States for a judgment for moneys allegedly overpaid by her for the taxable year 1954 pursuant to a deficiency assessment by the District Director of Internal Revenue. The cause is submitted to the court for trial without a jury upon a stipulation of facts. The only issue presented for decision is the question of the interpretation and application to the stipulated facts of the provisions of Sec. 112(b) (11) of the Internal Revenue Code of 1939, as amended, 26 U.S.C.A. (I.R.C.1939) § 112(b) (11).

The basic facts giving rise to the deficiency assessment, and, ultimately, to this suit, arise out of the reorganization of Wilkins Pipe & Supply Co., a corporation having its principal place of business in the City of Peoria, Illinois, and hereinafter referred to as Wilkins Pipe. From 1934 to 1953, Wilkins Pipe conducted a business for the wholesaling of plumbing fixtures and supplies, industrial valves, pipes and fittings, and related products upon premises commonly known as 1008–10 South Adams Street, Peoria, Illinois. The corporation was the owner of the real estate and improvements thereon, which was used in its entirety to house the corporation's wholesale business. From 1934 until the time of his death in 1954, plaintiff's husband, Charles L. Wilkins, was either the sole shareholder or the controlling shareholder of Wilkins Pipe, and at all times material to this cause he was the sole shareholder of that corporation. Also, during that whole period of time, Mr. Wilkins actively controlled the whole of the business operation of the corporation.

On November 20, 1953, a special meeting of the board of directors of Wilkins Pipe was held, at which a resolution was adopted recommending to the shareholders of the corporation that a new corporation under the name of Charles L. Wilkins, Inc., which is hereinafter referred to as Wilkins, be organized, and that Wilkins Pipe would transfer to such new corporation all lands, buildings and non-business assets of Wilkins Pipe in exchange for all of Wilkins' common stock. That resolution further provided that Wilkins Pipe would then transfer all of the stock of Wilkins to its shareholders pro rata. On the same day, at a special shareholders' meeting, Mr. Wilkins approved the recommendation of the board of directors and, thereafter, on November 23, 1953, the board of directors of Wilkins Pipe authorized certain named persons to organize a new corporation and to subscribe to its capital stock. Wilkins was then incorporated under the laws of the State of Illinois, and its board of directors, by resolution, authorized the issuance of 565 shares of common stock to Wilkins Pipe in exchange for the lands and buildings commonly known as 1008–10 South Adams Street, which had a book value of $87,202.50. That resolution also provided that the premises, when conveyed to Wilkins would be leased back to Wilkins Pipe for use in the conduct of its business. On May 7, 1954, the reorganization was completed when Wilkins Pipe delivered its warranty deed conveying the premises to Wilkins, and received as consideration therefor all of the authorized issue of Wilkins' capital stock, namely, 565 shares. The two corporations then entered into a lease agreement whereby the premises were leased back to Wilkins Pipe. Due to certain income tax adjustments, the book value of the real estate was increased, and Wilkins issued an additional 64 shares of its common stock to Wilkins Pipe to compensate the latter corporation for the increased book value.

In the meantime, and prior to the formal completion of the plan of reorganization, Mr. Wilkins died, testate, on February 20, 1954. Plaintiff, pursuant to the provisions of Mr. Wilkins' will, was appointed executor of his estate. By his will, Mr. Wilkins bequeathed all of his stock in Wilkins Pipe to plaintiff. Upon the death of Mr. Wilkins, plaintiff, first as executor of his estate, and finally as transferee of the shares of Wilkins Pipe, took over the affairs of her de-

ceased husband, including the reorganization of Wilkins Pipe.

Simultaneously with the issuance to it of the Wilkins shares, Wilkins Pipe transferred the certificates representing such shares, i. e., for 565 shares and 64 shares, respectively, to plaintiff.

Plaintiff, as executor of the estate of Charles L. Wilkins, deceased, filed a fiduciary income tax return for the period from February 20, 1954 to December 31, 1954, but did not report any income to the estate on account of the receipt by her of the Wilkins stock. She did not report any income to herself on account of the receipt of those shares in her personal income tax returns for either of the years 1954 or 1955.

The District Director of Internal Revenue determined that plaintiff, as transferee of the Wilkins stock, had received a corporate dividend which was taxable as income under the provisions of the Internal Revenue Code. On December 29, 1958, the District Director, by 90-day letter, assessed a deficiency in the income tax paid by plaintiff for the year 1954 in the amount of $63,931.23. Thereafter, on January 14, 1959, plaintiff paid the alleged deficiency in full, together with interest thereon to January 15, 1959, to the District Director in the aggregate amount of $78,315.74. Plaintiff then filed her claim for refund of latter sum with the District Director, contending that the organization of Wilkins was a spin-off reorganization of Wilkins Pipe which was tax free under the provisions of Section 112(b) (11) of the Internal Revenue Code of 1939, as amended; her claim for refund was denied and this suit was instituted praying judgment against the United States for the amount paid by plaintiff pursuant to the deficiency assessment, plus statutory interest.

Section 112(b) (11) provides as follows:

"(11) Distribution of stock not in liquidation. If there is distributed, in pursuance of a plan of reorganization, to a shareholder of a corporation which is a party to the reorganization, stock (other than preferred stock) in another corporation which is a party to the reorganization, without the surrender by such shareholder of stock, no gain to the distributee from the receipt of such stock shall be recognized unless it appears that (A) any corporation which is a party to such reorganization was not intended to continue the active conduct of a trade or business after such reorganization, or (B) the corporation whose stock is distributed was used principally as a device for the distribution of earnings and profits to the shareholders of any corporation a party to the reorganization."

The government concedes that the transaction in which Wilkins was organized was a reorganization of Wilkins Pipe within the meaning of Section 112(g) (1) (D) of the Code, 26 U.S.C.A. (I.R.C.1939) § 112(g) (1) (D), and that Wilkins' activities of owning and leasing real estate is "the active conduct of a trade or business" within the commonly understood meaning of that phrase. The reorganization here involved cannot be construed as being, principally, a device for the distribution of earnings and profits to the shareholders of Wilkins Pipe as the stipulated facts, as hereinafter further summarized, clearly reveal. The government, however, stresses the phrase "to continue" contained in exception (A) of the subsection, and contends that the tax-exemption provisions of the subsection do not apply unless the new corporation which is born in the reorganization continues the active conduct of a trade or business previously conducted by the original corporation from which the assets of the new corporation were "spun-off".

By pre-trial order dated May 6, 1960, this court fixed the principal issue remaining for decision, to-wit: "Whether, in a reorganization involving the transfer of assets to a newly created subsidiary corporation and the simultaneous transfer of its shares to the holders of

transferor's shares, the general intent of the statute Sec. 112(b) (11) I.R.C. 1939 requires, as a condition to the granting of tax-free status to such reorganization, that the business of the subsidiary corporation be comprised of either: (1) One previously carried on by the former parent corporation, or (2) A business or function contemplated or one which could have been carried on by the parent corporation."

In order better to define the relationship of that issue to the stipulated facts of this case, the background of the reorganization of Wilkins Pipe is summarized as follows. At all pertinent times, Mr. Wilkins had been the sole shareholder of Wilkins Pipe. From the organization of that corporation until his death, Mr. Wilkins had assumed all responsibility for active management of the business and assets of the corporation and had operated the business, in that respect, in the manner of a sole proprietorship. In 1953 Mr. Wilkins had advanced in age, was in ill health and had been advised by his physician that his health required that he reduce his business responsibilities. At that time, also, the wholesale business of Wilkins Pipe had increased to such extent that it was deemed necessary that the burden of management be spread among a number of personnel. In that year Mr. Wilkins employed George Fry & Associates, hereinafter referred to as Fry, to make a survey of the corporation, its organization and business and to make recommendations in aid of lessening the managerial duties of Mr. Wilkins. Fry's report, based upon its survey of Wilkins Pipe, was submitted to the corporation under date of October 27, 1953. The Fry report concluded that the continued expansion and healthy operation of the business required that the younger key men of Wilkins Pipe be placed in responsible positions of management and that the ownership and operation of that corporation be broadened by the transfer of a part of the shares thereof to such younger key personnel, or to outside interests. The report further concluded that the established wholesale business was not readily saleable either to the younger personnel of the corporation or to outside interests, because the assets of the corporation were top-heavy with fixed assets, by comparison with liquid operating assets; that outside capital would be difficult, or impossible, to obtain because of the substantial proportion of total assets of Wilkins Pipe represented by the real estate which that corporation owned and occupied. The Fry report finally recommended that all land and improvements thereon be separated from the corporation, and that only the operating assets be retained. By that device, the report suggested that the capitalization of Wilkins Pipe could be lowered and thus lessen the size of the initial investment required to purchase all or a part of the operating business, and would increase the working capital available to the expansion of its business.

On November 20, 1953, the Fry report was considered by the board of directors of Wilkins Pipe and a resolution was then adopted which found its fruition in the reorganization as hereinabove summarized. Further evidence of the business nature of the whole reorganization is found in an agreement executed July 30, 1956, between plaintiff, who was then the sole shareholder of Wilkins Pipe, and five of the executives of that corporation, whereby plaintiff agreed to sell and transfer to such executives 2,300 of the 4,402 shares of Wilkins Pipe then outstanding.

With the business motive of the reorganization thus stipulated, and in the light of the government's concession that Wilkins has, since the reorganization, engaged in the active conduct of a trade or business, does the statute contain the implication that the trade or business conducted by Wilkins must be the continuation of a trade or business which had previously been conducted by Wilkins Pipe or previously contemplated by the latter corporation?

The type of corporate reorganization involved in this case is commonly re-

ferred to as a spin-off, i. e., a part of the assets of a corporation are transferred to another corporation in exchange for its capital stock, while the parent corporation retains a part of its assets and continues its business activities. The tax consequences of the reorganization here involved must be determined by the provisions of the above-quoted subsection of the 1939 Code. Subsection (11) was added to subsection 112(b) of the Code by amendment in 1951, Public Law 183, approved October 20, 1951, c. 521, 65 Stat. 452, and, subsequently, has been superseded by § 355 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 355.

As a consequence of the short life of the statute under consideration, Bondy v. Commissioner, 4 Cir., 269 F.2d 463, is the only reported case found in which subsection (11) has been judicially construed. The taxpayer involved in that case was the sole stockholder of Market Motors, Inc., a corporation engaged in business as a Ford automobile dealer. Market Motors had erected a large building for its use in that enterprise. Ford Motor Company thought the building to be impractical and a threat to the financial success of the dealership. Ford insisted that the building be removed from the assets of Market Motors, upon threat of revocation of the dealership franchise. In 1950, Market Motors organized Bondy Real Estate, Inc., and transferred the building to Real Estate, taking a lease back of the premises from Real Estate. In consideration of the conveyance of the premises Market Motors received all of Real Estate's capital stock. It was also contemplated that the stock would be distributed by Market Motors to the taxpayer but the step was delayed because of the fear that taxpayer would thereby be subjected to liability for income tax on the distribution. Ford was still unhappy with the arrangement and insisted that a more removed alienation of the real estate be effected. Subsequently, Market Motors organized P.E.B., Inc., subscribed for all of its capital shares and, in payment therefor, transferred to P.E.B. all of the outstanding stock of Real Estate. Immediately thereafter, Market Motors transferred to taxpayer all of the P.E.B. stock.

Upon the facts recited, the court held that the transaction involved was clearly qualified as a tax-exempt reorganization under the statute. A judgment of the Tax Court, 30 T.C. 1037, against taxpayer of an income tax deficiency was reversed.

The Bondy case is not precisely in point on the facts of the case at bar for the reason that one of the corporations involved in the Market Motors reorganization had engaged in the business of leasing real estate for a period of approximately two years prior to the transfer of P.E.B. stock to the taxpayer. To that extent a distinction must be drawn between the facts of the Bondy case and the facts of the case at bar.

The government points to that distinction and argues that the key to the Bondy decision is the fact that, prior to the completion of the asset spin-off by Market Motors by the incorporation of P.E.B., a business of holding and leasing real estate had been established by a Market Motors subsidiary which P.E.B. continued. I do not believe the Bondy decision can be so restricted. After reciting the facts of the reorganization in some detail, the court said, 269 F.2d at page 465:

"The transaction clearly qualifies as a tax-exempt reorganization under the statute. Obviously, the distribution was 'to a shareholder of a corporation which is a party to the reorganization', the stock distributed was 'stock (other than preferred stock) in another corporation which is a party to the reorganization, without the surrender by such shareholder' of any stock. Again, none of the corporations party to the reorganization intended to, or did, discontinue the active conduct of its trade or business—there was 'a continuity of enterprise'."

At page 466 of 269 F.2d Reports, the court stresses the urgency and necessity for divorcing the ownership of the real estate more completely from the Market Motors assets, in order that its franchise and its dealership would not be jeopardized. I think the key of the Bondy opinion, as it relates to the interpretation of the statute, is that each corporation involved in the reorganization, after the spin-off is completed, must be intended to engage in a trade or business which represents a continuity of a part of the total enterprise of the parent corporation prior to the reorganization. That conclusion is borne out by the concluding sentences of the court's opinion, 269 F.2d at page 467, as follows: "The transaction under review was only a divisive reorganization—a mere separation in the corporate ownership of the business properties, leaving the control of the business unchanged even in degree. Cf. Income Tax Regulations 118, I.R.C.1939, secs. 39.112(b) (11)——2. Petitioner, we declare, holds the P.E.B. stock tax free."

The adoption of the government's premise that the phrase "to continue the active conduct of a trade or business after such reorganization" must be construed as a requirement that the new corporation continue in the conduct of a part of the business in which the parent corporation had been previously engaged would do violence to the statutory language. The words used in the revenue laws are to be given their common, ordinary meaning, Crane v. Commissioner, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301; Old Colony R. Co. v. Commissioner, 284 U.S. 552, 52 S.Ct. 211, 76 L.Ed. 484, and the underlying purpose of the act must govern its application to particular situations.

As applied to industrial and commercial pursuits, the word "business" has several commonly understood meanings. In its broadest sense, "business" means the application of assets and labor to the production of financial gain. In its narrowest sense, the word is used to denote a specific trade or commercial undertaking. In a third sense, it is commonly used as a descriptive term to denote the part of a given community in which commercial and industrial activities are conducted. See Webster's New Twentieth Century Dictionary, 2d Ed., p. 245.

This court will not assume that the word "business", as used in subsection (11), was intended by Congress to be construed in its narrowest sense as the government insists it must be construed, in the absence of such a definition imposed by Act of Congress or controlling judicial precedent. Moreover, the legislative history of subsection (11) is indicative that Congress used the phrase "trade or business" in its broad sense of the application of assets and labor to the production of profit. Thus, Senator George stated that the subsection was intended to conform the tax treatment of corporate spin-offs to the treatment previously accorded to corporate split-ups, in which a corporation is divided into several new corporations and the original corporation is dissolved. Continuing his comments, Senator George said that tax-exempt treatment "has been denied in the case of a spin-off where a portion of the assets of the original corporation is turned over to a new enterprise and the original corporation remains in existence. This distinction between a split-up and a spin-off is, in the opinion of your committee, impossible to justify. Therefore, the bill contains a provision under which the spin-off may also qualify for treatment as a tax free reorganization." 96 Cong.Rec., p. 13276.

The Senate committee, in reporting subsection (11) to the Senate felt "that it is economically unsound to impede spin-offs which break up businesses into a greater number of enterprises, when undertaken for legitimate business purposes." S.Rep.No. 781, 82d Cong., 1st Sess., (1951–2 Cum.Bull. 458, 499). Pertinent to the issue before the court, the Senate Committee further stated, Ibid, at 529: "Under existing law a corporate reorganization taking the form

of a 'split-up' may be, and usually is, tax free. Your committee's bill provides the same treatment for 'spin-offs.' This is done because your committee believes that corporate reorganizations which accomplish substantially the same effect should be given the same tax treatment. Moreover, your committee considers it economically unsound to impede reorganizations which break business up into smaller units.

"However, your committee's bill provides for the non-recognition of gains or losses in the case of spin-offs only where both the corporation which is 'spun-off' and the existing corporation are intended to continue carrying on business after the reorganization."

 The term, "spin-off", implies the transfer of assets, as distinguished from the transfer of particular business enterprises, from one corporation to another, and it appears that the Senate committee so employed that term. It further appears that that committee used the term "business" in its broad sense as meaning the application of such transferred assets to the conduct of productive enterprise. This is emphasized by the committee's belief that it is economically unsound "to impede spin-offs which break up businesses into a greater number of enterprises, when undertaken for legitimate business purposes." Id. at 499. This court will not assume that Congress gave encouragement to the creation of new business enterprises by spin-off reorganization by the grant of tax-free status to the transaction and, in the same bill, by implication, proscribed diversification of enterprise by requiring that the spun-off assets must be applied, only, to a continuation of the same productive activity of the parent corporation. The continuance in a trade or business proviso requires only that the spun-off assets be used for a business purpose, and that the transaction be not merely a paper transfer without business significance for tax advantage only.

The transaction in the case at bar is a divisive reorganization. Prior to the transaction, plaintiff, as the sole stockholder of Wilkins Pipe, controlled the operation and all assets of that corporation. After the transaction, she owned all of the capital stock of Wilkins as well. However, she still controlled the same assets, now divided in ownership between the two corporations, and the value of the assets represented by her aggregate holdings remained the same after, as before, the reorganization. She holds the Wilkins stock tax free.

Judgment is entered for the plaintiff and against the government in the amount of $78,315.74, plus the statutory interest thereon.