**Perry E. BONDY and Hattie Bondy, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 7853.

United States Court of Appeals Fourth Circuit.

Argued June 18, 1959.

Decided Aug. 5, 1959.

464

David H. Wilson, Akron, Ohio (Brouse, McDowell, May, Bierce & Wortman, Akron, Ohio, on the brief), for petitioners.

John J. Pajak, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before HAYNSWORTH, Circuit Judge, and BARKSDALE and BRYAN, District Judges.

ALBERT V. BRYAN, District Judge.

The Tax Court rejected the petitioner's contention that the receipt by him in 1953 from his solely owned corporation of the entire capital stock of a subsidiary corporation was not taxable, as income, because it was distributed in a plan of corporate reorganization—a "spin-off" to the tax versant—in which, by section 112(b) (11), Internal Revenue Code of 1939 [1], the receipt is not recognized as a taxable gain. In this ruling—holding it to be an ordinary dividend—we think the Tax Court erred.

So far as pertinent section 112(b) (11) reads:

"If there is distributed, in pursuance of a plan of reorganization, to a shareholder of a corporation which is a party to the reorganization, stock (other than preferred stock) in another corporation which is a party to the reorganization, without the surrender by such shareholder of stock, no gain to the distributee from the receipt of such stock shall be recognized unless it appears that (A) any corporation which is a party to such reorganization was not intended to continue the active conduct of a trade or business after such reorganization, or (B) the corporation whose stock is distributed was used principally as a device for the distribution of

[1]. As added by Sec. 317(a) of the Revenue Act of 1951, Public Law 183, approved October 20, 1951, c. 521, 65 Stat. 452; 26 U.S.C.1952 ed. § 112(b) (11).

earnings and profits to the shareholders of any corporation a party to the reorganization."

The transaction here plainly fulfills the statute's exactions. Since 1948 petitioner-taxpayer (his present wife Hattie is only a formal co-petitioner) has been the sole stockholder of Market Motors, Inc. It was organized in 1938 with an Ohio charter and thereafter at Akron carried on the business of a Ford automobile dealer. Soon after petitioner became its owner, Market Motors erected for its use a large building, indeed one of the largest of its kind in the State. Ford Motor Company, in its dealer surveillance, thought the building impractical and a threat to the financial success of Market Motors. For this reason Ford insisted that it be taken out of the assets of Market Motors.

The Ford dealership was revocable at will. Essential to its business, Market Motors could not risk the loss of the franchise. With this in mind, in July, 1950 it incorporated Bondy Real Estate, Inc. and transferred the building to Real Estate, Market Motors becoming its lessee. In consideration for this conveyance Market Motors received all of Real Estate's capital stock. The plan also contemplated the distribution by Market Motors of all of Real Estate's capital stock to petitioner. However, this step was stayed by the fear that petitioner would thereby be subjected to an income tax on the distribution.

Ford's representative, nevertheless, pressed for a more removed alienation of the real property holding. Also, in September, 1952 May Bondy, to whom petitioner had been married for thirty-two years, filed suit for divorce. A restraining order was issued in the litigation preventing petitioner from disposing of any of his property, at the same time forbidding Market Motors, as well as Real Estate, from paying him any salary or dividends and from transferring any stock shares. Because it was petitioner's chief asset, apparently no property settlement could be made without involving the Market Motors stock. In fact, as security for her alimony payments May Bondy was demanding a pledge of three-fifths of this stock. A further demand was that this stock on petitioner's death become her sole property.

Although opposing the divorce, petitioner recognized the possibility of defeat. He saw, too, a probability that the Market Motors stock would be included in any property decree. He refused to consider any separation agreement which would embrace the Market Motors stock lest, upon May's acquisition of a part of the stock, Ford cancel the franchise.

At this time petitioner learned of the availability of section 112(b) (11) supra, enacted in 1951. Without suicidal taxation, petitioner now could have Market Motors alien its building to the satisfaction of Ford, and at the same time answer the demand of petitioner's wife upon the Market Motors stock without jeopardizing the dealership. To this end, Market Motors formed P.E.B. Inc., subscribed for all of its capital stock and in payment transferred to P.E.B. all of the outstanding stock of Bondy Real Estate. Whereupon, on April 3, 1953 Market Motors distributed to petitioner all of the P.E.B. stock. Actually, three-fifths of the stock was placed in an escrow set up in the separation agreement with his wife which followed immediately and was later approved in their divorce decree.

The transaction clearly qualifies as a tax-exempt reorganization under the statute. Obviously, the distribution was "to a shareholder of a corporation which is a party to the reorganization", the stock distributed was "stock (other than preferred stock) in another corporation which is a party to the reorganization, without the surrender by such shareholder" of any stock. Again, none of the corporations party to the reorganization intended to, or did, discontinue the active conduct of its trade or business—there was "a continuity of enterprise". See Income Tax Regulations 118, I.R.C.1939,

sec. 39.112(b) (11)–2; Senate Report 781, 82 Cong. 1st Sess. 1951, U.S.Code Congressional and Administrative Service p. 2029.

█ But, says the respondent Commissioner, the statute was not met because P.E.B. was "used principally as a device for the distribution of earnings and profits to the shareholders". Here the Commissioner's argument is that "there was no business purpose in the transfer of Bondy Real Estate stock to P.E.B.". He asserts that the overriding objects of the reorganization were to distribute to the petitioner assets with which to quiet his wife's demands and to do so in a way to avoid taxes. For the exception of 112(b) (11) to apply, it must be conceded, the reorganization has to be germane to the business of the corporation. Gregory v. Helvering, 1935, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596.

█ But the facts already recited and uncontroverted flatly refute the Commissioner's position. They positively affirm that the preservation of the dealership was the centerpiece of the reorganization. The reorganization was not dependent on the separation agreement or a divorce; it had a value to Market Motors irrespective of either. However, protection of the dealership was, in truth, even a factor in the formulation of the separation agreement. The contract was fashioned so as to put Market Motors beyond the reach of May Bondy. If the reorganization was mainly for a business reason, the adoption of a tax-escape method to accomplish it did not render the reorganization unacceptable under the statute. Gregory v. Helvering, supra, 293 U.S. 465, 469, 55 S.Ct. 266. At all events, the reorganization was not a proscribed device "principally".

The interval of apparent inaction between the transfer of the Market Motors building to Real Estate in 1950 and the corporate reorganization in April, 1953 does not prove that the domestic eruption rather than a corporate purpose instigated the reorganization. In fact there was no inaction. The alienation of the building had not secured the dealership from danger. Despite the absence of any finding on the point by the Tax Court, the evidence shows that Ford's representative continued to press, reasonably or unreasonably, for a more distant separation. Recall, also, that the divorce suit constantly menaced the dealership and required continuous watchfulness over it.

Nor did the maintenance of the injunction force the reorganization, or convert it into a component and dependent of the divorce proceeding. That decree only acted exteriorly upon the stocks and corporations in suit, affecting their possession merely and in no way disturbing their ownership. It did, of course, restrict the mechanics of the reorganization, but solely by way of affording May Bondy a means of pursuing the security she was seeking. But this did not make the reorganization one with the agreement or the divorce.

█ Lastly the respondent argues that after the reorganization, the petitioner did not retain control of P.E.B. and, therefore, it was not a reorganization within the definition of section 112(g) (1), I.R.C.1939 [2]—"a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred".

This assertion is premised on the terms of the escrow created in the separation agreement. There it was provided that the three-fifths of the P.E.B. stock should be held to secure payment of the support money. It was further stipulated that at any time the petitioner could terminate these payments by surrendering the

2. As amended by Sec. 213(b) of the Revenue Act of 1939, c. 247, 53 Stat. 862; 26 U.S. C.1952 ed. § 112(g) (1).

stock to his former wife. It was agreed, too, that upon his death, May surviving, the stock would be left to her absolutely, if it had not been released to her previously, and that absent both of these events, the stock would be bequeathed by petitioner to their children.

All the while, however, petitioner was the record owner. He reserved the right to vote the stock in the current course of business. As soon as P.E.B. and Real Estate were free of debt, he would be entitled to all dividends on the stock. Indeed, the stock remained subject to a pledge for his own debt. Upon his death, semble, the stock would be liable to his creditors' claims. We find he was still in such control of the stock—and there was such a "continuity of interest"—as section 112(g) (1) demanded.

It should be noted, in this connection, that under section 112(g) (1) the time at which the control must exist is "immediately after the transfer". There is no doubt that petitioner was in control of the P.E.B. stock after the reorganization, for the separation agreement had not then been concluded. Neither the agreement nor the divorce needed to follow to make the reorganization effectual and useful. American Bantam Car Co., 11 T.C. 397, affirmed with summary discussion 3 Cir., 1949, 177 F.2d 513, certiorari denied 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344; Scientific Instrument Company, 17 T.C. 1253, affirmed without discussion 6 Cir., 1953, 202 F.2d 155.

Petitioner-taxpayer has overcome the presumption of correctness accorded by law to the Commissioner's determination. Nor can the affirmance by the Tax Court stand. Both decisions, on almost uncontroverted evidence, draw a conclusion erroneous in law. The transaction under review was only a divisive reorganization—a mere separation in the corporate ownership of the business properties, leaving the control of the business unchanged even in degree. Cf. Income Tax Regulations 118, I.R.C.1939, secs. 39.112(b) (11)–2. Petitioner, we declare, holds the P.E.B. stock tax-free.

Reversed.