Kenneth E. **CARNAHAN** and Sarah Carnahan, Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

Civ. No. 2021.

United States District Court
D. Montana,
Great Falls Division.

Oct. 31, 1960.

---

H. Cleveland Hall, Edward C. Alexander and John C. Hall, Great Falls, Mont., for plaintiffs.

Charles K. Rice, James P. Garland, Lyle M. Turner and Jerome S. Hertz, Washington, D. C., and Krest Cyr, Butte, Mont., for defendant.

JAMESON, District Judge.

Plaintiff taxpayers, husband and wife, seek recovery of $52,843.96 paid under protest on August 11, 1958, pursuant to

an assessment of income tax deficiency for the year 1952, with penalties and interest. The question presented is whether the Commissioner of Internal Revenue properly determined that Sarah Carnahan realized taxable gain upon the exchange of old common stock of McNair Realty Company for new series "B" nonvoting stock within the meaning of Section 112 of the Internal Revenue Code of 1939.[1]

The plaintiffs are residents of California, Sarah Carnahan having resided in that state since her marriage in 1925. Plaintiffs filed their joint income tax return for 1952 with the District Director of Internal Revenue at Helena, Montana. Their principal income for that year was derived from Sarah's stock ownership in McNair Realty Company.

McNair Realty Company is a Montana corporation, organized in 1933 with a capitalization of $100,000, divided into 1,000 shares of common stock of the par value of $100 per share.[2] As of September 1, 1952, the plaintiff Sarah Carnahan and her two brothers, C. S. McNair and B. P. McNair, Jr., each owned 333 shares, and Kenneth Dunlap, one share. Subsequent to that date B. P. McNair, Jr. liquidated his stock interest in the corporation in a transaction which is the subject of McNair Realty Co. v. United States, D.C., 188 F.Supp. 451. At about the same time Sarah Carnahan and C. S. McNair, the remaining stockholders, decided to amend the articles of incorporation of McNair Realty Company with respect to the form of capitalization. At a meeting of the stockholders held October 27, 1952, at which Sarah Carnahan was represented by proxy, the article relating to capital stock was amended to read:

"The amount of its capital stock is One Hundred Thousand ($100,000.-00) Dollars. The capital stock shall be divided into two (2) classes designated as follows:—

"1. Five Hundred (500) shares of common stock, series 'A', without par value, which stock shall have the sole right to vote at any and all meetings of the stockholders of said corporation.

"2. Five Hundred (500) shares of common stock, series 'B', each of the par value of One Hundred ($100.00) Dollars, which stock shall have no voting rights or powers. Said stock when issued may, at the option of the Board of Directors, be called for redemption and cancellation from time to time in such number of shares as may be determined by the Board, and the Board of Di-

---

1. Section 112 of the Internal Revenue Code of 1939, as amended, as far as pertinent, reads:

   "Sec. 112. Recognition of gain or loss—

   "(a) *General rule.* Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

   "(b) *Exchanges solely in kind—*
   * . * * * *
   "(2) *Stock for stock of same corporation.* No gain or loss shall be recognized if common stock in a corporation is exchanged solely for common stock in the same corporation, or if preferred stock in a corporation is exchanged solely for preferred stock in the same corporation.

   "(3) *Stock for stock on reorganization.* No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are,

in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
   * * * * *
   "(g) (As amended by Sec. 213(b), Revenue Act of 1939, c. 247, 53 Stat. 862, and Sec. 121(d), Revenue Act of 1943, c. 63, 58 Stat. 21) *Definition of Reorganization.* As used in this section (other than subsection (b) (10) and subsection (*l*)) and in section 113 (other than subsection (a) (22))—

   "(1) The term 'reorganization' means * * * (E) a recapitalization * * *." 26 U.S.C.A. Int.Rev.Code of 1939, as amended, § 112.

2. The company was formed to take over the assets of the estate of Mrs. B. P. McNair, the mother of the three principal stockholders, who were her sole heirs. The corporation at all times has been a closely held, family corporation...

rectors is hereby empowered, and there is hereby delegated to the Board of Directors the power to determine the number of shares of series 'B' stock to be issued, and the time and manner of calling the same or any part thereof for redemption, and the amount to be paid therefor upon such redemption, provided, however, that in no event shall such stock or any part thereof be redeemable at a price less than the book value thereof, and, the manner and time of declaring and paying dividends on either or both of said series 'A' and series 'B' shares of stock which is issued and outstanding."

At a meeting of the board of directors held immediately after the stockholders' meeting, a letter from Sarah was presented and read into the minutes. After reciting that she had consented to the above amendment, she asked permission to exchange her stock for the series "B" nonvoting stock, stating:

"Upon such exchange it is my purpose to proceed with the liquidation of my stock holding in McNair Realty Company. To that end and for that purpose only I make the following proposal to be proceeded with after the exchange has been made:[3]

\* \* \*

"(d) I propose to set up an irrevocable trust as to the remaining 296 shares of series 'B' common stock with the Union Bank and Trust Co. of Helena, Montana as Trustee. I direct that such 296 shares be issued directly to the Union Bank and Trust Co. as Trustee by the corporation. With respect to such stock it is my under-

standing that redemption will be made thereof by the corporation as quickly as may be convenient, legal and proper to the end that my holdings in the corporation, either directly or indirectly shall be fully and completely liquidated.

"I would like to have your full approval of these proposals as soon as may be possible so that I may take steps to complete my own arrangements."

Sarah's proposal was accepted by the directors of McNair Realty Company. On November 13, 1952, C. S. McNair surrendered 333 shares of the old stock, and in lieu thereof 332 shares of the new series "A" common stock were issued to McNair and one share of Florence Kahla. Sarah Carnahan surrendered 333 shares of the old stock and received in lieu thereof 296 shares of the new series "B" common stock, together with $7,200 in cash and real property having a value of $15,000. Pursuant to Sarah's direction, the 296 shares of series "B" stock were issued directly to Union Bank and Trust Company of Helena, Montana, as trustee under a trust agreement dated November 5, 1952.[4]

There was no change in the actual value of the stock. The old common stock was worth $600 per share, and the series "A" and "B" stock both have the same value.

During the years 1953, 1954, and 1955, 96 shares of the series "B" stock were redeemed by the corporation. A capital gains tax was paid by the plaintiffs at the time of each redemption. No shares have been redeemed since, although a contract for the purchase of the remaining 200 shares for the sum of $120,000

3. Sarah's proposal also included the transfer to the corporation of 25 shares of stock in exchange for residence property and 12 shares for $7,200 in cash, and the purchase by the corporation of certain mineral rights owned by Sarah, the purchase price to be credited against an amount for which she was indebted to the corporation. The tax consequences of these transactions are not in dispute.

4. Under the terms of the trust agreement, the trustee was to pay the income to Sarah in monthly installments for life, and upon her death to pay the net income in equal shares to her son and daughter until the daughter attained age 50 and the son age 35. Thereafter, they or their survivors were to share the corpus of the trust.

was approved by the directors of the corporation in September, 1955. Payments were made on this contract in 1956 in the amount of $18,000. Dividends were paid on the stock in 1953, 1954 and 1955. Since 1956 no contract payments have been made and no dividends have been paid.

In their federal income tax return for 1952 plaintiffs did not report any gain on the exchange of the 296 shares of old stock for the new series "B" stock. The plaintiffs contend (1) that this transaction represented an exchange of common stock solely for common stock in the same corporation and that accordingly there was no taxable gain by reason of the exception contained in Section 112(b) (2) of the Internal Revenue Code of 1939; and (2) that the exchange of stock was made pursuant to a plan of reorganization and that accordingly there was no taxable gain by reason of the exception contained in section 112(b) (3).[5]

In its brief filed in advance of pretrial conference, the defendant contended (1) that the "Series B stock received by Sarah Carnahan was, notwithstanding the label attached to it, preferred stock and that, therefore, for federal income tax purposes, she exchanged common stock for preferred stock—a transaction not exempt from tax recognition under Section 112(b) (2)"; and (2) that the "reshuffling of stock ownership of the McNair Realty Company in 1952 fails to qualify as a reorganization for the reason that it was not undertaken for any purpose germane to the conduct of the corporate business".

At the pretrial conference counsel indicated that the defendant might desire to rely upon an additional theory of defense. The memorandum of the conference recites that the issues were framed by the complaint and answer, that the memorandum did not supersede the pleadings but was supplemental thereto, and included the following paragraph:

"Counsel for defendant stated that it was possible the defendant would desire to rely upon an additional theory of defense. If so, counsel for defendant will serve and file memorandum with respect to such defense not less than two weeks in advance of the date set for trial. Otherwise, it will not be necessary for counsel to file any further briefs in advance of trial. Counsel will be given a reasonable time within which to file briefs after completion of the trial and their receipt of a transcript of the trial."

No memorandum was filed by the defendant in advance of trial. In its post-trial brief, filed several months after trial and after plaintiff's initial brief, the defendant for the first time contends that Mrs. Carnahan may not avail herself of the benefits of either section 112(b) (2) or section 112(b) (3) because: "That which she received for her old common stock was not stock within the meaning of either statute", but rather that, "She exchanged stock for a trust life estate in a transaction in which the remaining interest in the trust was to go to Mrs. Carnahan's children".

Plaintiffs contend that in view of the provisions of the memorandum of pretrial conference quoted above, the defendant is now precluded from asserting this defense. Defendant's answer "admits or avers that plaintiff Sarah Carnahan surrendered to McNair Realty Company 333 shares of the original common stock owned by her and that she subsequently received from McNair Realty Company 296 shares of its new series "B" stock, denominated as common stock, having a fair market value of $600 per share * * *". Certainly in view of this admission in the answer and the recital in the memorandum of pretrial conference, the defendant should have asserted its new defense within the time specified in the memorandum.

A pretrial order defining the issues is binding upon both parties, particularly where, as here, the order was entered with the assent of the parties.[6] In

---

5. The provisions of section 112(b) (2) and (3) are set forth in Note 1.

6. See Fowler v. Crown-Zellerbach Corp., 9 Cir., 1947, 163 F.2d 773; Montgomery

**466**

view of the fact, however, that counsel for the defendant did indicate that an additional issue might be presented, I have concluded to consider this defense even though it was not timely presented.

Did Sarah Carnahan exchange common stock solely for common stock in the same corporation, as plaintiffs contend; or did she exchange common stock for either preferred stock or a trust life estate, as defendant alternately contends? Counsel apparently agree that there are no cases construing section 112(b) (2) where this question has been presented.

The series "A" and "B" stocks were properly issued under Montana law[7] pursuant to the amended articles of incorporation. Since the articles did not authorize preferred stock, none could be issued. The attributes of preferred stock were considered in Allen v. Montana Refining Co., 1924, 71 Mont. 105, 227 P. 582, 586, where the court said in part: "As the term itself implies, 'preferred stock' is a stock which gives to the holder a preference over the holder of common stock with respect to the payment of dividends."

The distinctions between common and preferred stock were summarized in Elko Lamoille Power Co. v. Commissioner of Internal Revenue, 9 Cir., 1931, 50 F.2d 595, 596, as follows: "The distinction between common stockholders and preferred stockholders may be said to be that the common stockholder is an owner of the enterprise in the proportion that his stock bears to the entire stock, and entitled to participate in the management, profit, and ultimate assets of the corporation. * * * A preferred stockholder is a mode by which a corporation obtains funds for its enterprise without

borrowing money or contracting a debt, the stockholder being preferred as to principal and interest, but having no voice in the management. * * * It differs only from other stocks in that it is given preference and has no voting right."

A revenue ruling in 1954[8] discusses the attributes of common and preferred stock under section 112(b) (2) in holding that the exchange of special stock of one series in a regulated investment company for special stock of a different series represents a taxable exchange of property. While the facts are distinguishable from the transaction here involved, certain language of the ruling is pertinent:

"The special stock in the instant case, both before and after the recapitalization is not *common stock since the holders thereof do not share ratably either in the earnings of the corporation or in its assets on liquidation,* it being specifically provided that the holders of shares of any designated series have no interest in the assets or income of any other series. * * * Neither is the special stock a *preferred stock since the holders thereof are not preferred as to dividends out of the entire earnings of the corporation* and are restricted to the earnings of the segregated assets representing his particular class of special stock. Likewise the holder of special stock has no *preference in the general assets of the corporation on liquidation,* excepting the right to share ratably with other members of his class in the segregated assets representing that particular class of special stock. * * *[9] (Emphasis added)"

---

Ward & Co. v. Northern Pacific Terminal Co., D.C.Or.1954, 17 F.R.D. 52.

7. R.C.M.1947 § 15–801(8) authorizes the issuance of stock of two or more classes, "with such designation, and with such voting powers, if any, with any desired limitations and restrictions thereof, as shall be stated in the original or amended articles of incorporation, and, if desired, in one or more series as to any class, and with such designation and description of the manner of issuing, preferences, limitations, restrictions, and other terms and conditions of or on which each class of stock, or series thereof, shall be issued, as shall be described and set forth in the original or amended articles of incorporation, * * *"

8. Rev.Rul. 54–65, CB 1954–1, page 101.

9. The ruling pointed out further that the certificate of incorporation provided for the issuance of common stock, with the

The series "B" stock issued to Sarah had no preference as to either dividends or general assets of the corporation. There is evidence, as defendant contends, that Sarah did from past experience anticipate that dividends would be paid regularly on the series "B" stock and the shares redeemed, as did the trust company.[10] There was no contractual obligation, however, on the part of the company to redeem the stock or pay dividends thereon. While the corporation had the right at its option to redeem the series "B" stock at book value, this was not a right or privilege given to Sarah, and she could not enforce redemption until the company exercised its option; nor could she compel the payment of any dividends. Moreover, as hereinabove set forth, it is agreed that the old common stock and the new series "A" and series "B" stock all had the same value. The exchange did not change the proportionate interest of Sarah in the corporation; nor did it add any value to her interest therein.

Defendant stresses the lack of voting power in the series "B" stock as evidence that it was not in fact true common stock. It is true that the right to vote is one of the common attributes of common stock. A combination of voting and nonvoting common stock, however, is not unusual, particularly in closely held corporations. Nonvoting common stock has been recognized in many decisions, including Helvering v. Sprouse, 318 U.S. 604, 63 S.Ct.

791, 87 L.Ed. 1029, where the court held that a dividend of nonvoting common stock paid to holders of voting and nonvoting common stock alike was not the subject of income tax if distributed to holders of both classes of outstanding stock in proportion to their respective holdings.

Section 1036 of the Internal Revenue Code of 1954 is identical with section 112(b) (2) of the 1939 code. Although the regulation under the 1939 code does not specifically refer to the exchange of voting for nonvoting stock,[11] the 1954 regulation does, and reads as follows:

"(a) Section 1036 permits the exchange, without the recognition of gain or loss, of common stock for common stock, or of preferred stock for preferred stock, in the same corporation. *Section 1036 applies even though voting stock is exchanged for nonvoting stock* or nonvoting stock is exchanged for voting stock. It is not limited to an exchange between two individual stockholders; it includes a transaction between a stockholder and the corporation * * * (Emphasis added)" [12]

It is my conclusion that the fact that the series "B" stock is nonvoting does not remove it from the realm of common stock within the meaning of section 112(b) (2).[13]

In support of its contention that Sarah exchanged stock for a trust life estate,[14]

---

normal characteristics of common stock, but this was entirely separate and distinct from any of the classes of special stock.

10. Prior to the exchange of stock, Sarah had been receiving $525 per month. Upon establishment of the trust, she began to receive a monthly income therefrom of $500 per month. After noting that Sarah had received a monthly check of some sort with "almost complete regularity" since 1927, Chester McNair testified that, "She understood that when there was money earned * * * it was available to her, and when it wasn't, of course, it wouldn't be."

11. Reg. 118; Sec. 39.112(b) (2)–1. Federal Tax Regulations, U.S.Code Cong. & Admin.News (1956).

12. Federal Tax Regulations, U.S.Code Cong. & Admin.News (1960), 1.1036–1.

13. See also 3 Mertens Law of Federal Income Taxation 88, § 20.36, which reads in part: "The two types of exchanges referred to in the provision are not interchangeable and preferred stock may not be exchanged for common stock without the recognition of gain. However, there may be an exchange of one class of common stock for another class of common stock, whether of a voting or nonvoting type, and the same rule applies to preferred stock."

14. As set forth above this is not in accord with the position of the defendant at pretrial conference or that of the Commissioner in assessing the deficiency. The Commissioner determined that "the

defendant argues that the exchange was "inextricably a part of the transaction in which Ben McNair's interest in the corporation was liquidated, and, even more inextricably, a part of the creation by Mrs. Carnahan of an irrevocable inter vivos trust having as its sole initial asset the 296 shares of series 'B' stock". It is true that the transactions were all consummated at about the same time, but does that show a single plan or purpose resulting in a single transaction for tax purposes?

The rule for which defendant contends is applicable where action is taken in several steps pursuant to a pre-existing contractual obligation and in accordance with a prearranged plan,[15] but "it must appear that the entire series of transactions has been carried out in accordance with a prearranged plan and that they are in fact component steps of a single transaction". The proper test is: "Were the steps so interdependent that the legal relations created by one transaction would have been fruitless without the completion of the series?" ACF-Brill Motors Co. v. Commissioner of Internal Revenue, 3 Cir., 1951, 189 F.2d 704, 707.

Defendant relies upon Morgan v. Helvering, 2 Cir., 1941, 117 F.2d 334, 336 and particularly upon Judge Hand's statement: "When § 112 * * * spoke of 'exchanges,' it did not mean such illusory exchanges which gave the parties no more than a title that they must disgorge; it contemplated enduring interests." Morgan v. Helvering, however, factually presented an entirely different situation. In a recital of the facts Judge Hand called attention to the fact that "the parties * * * made a contract whose performance involved the whole series of separate transactions detailed above (six transactions), and from that it follows that each party, if he performed his part, could have compelled the other to perform his." We have no such contract here. Nor do we have a

series of "fleeting transactions" for the purpose of tax avoidance. More pertinent is Judge Hand's statement in Helvering v. Schoellkopf, 2 Cir., 1938, 100 F.2d 415, 417: "The underlying purpose of the exemptions in § 112 is to disregard corporate manipulations which do not substantially affect the shareholders' interest in the properties."

Largely by reason of an impecunious husband, for some time Sarah had considered the advisability of creating a trust to protect herself and her children. She had discussed the matter with her brother Chester. Neither Chester nor the corporation, however, was a party to the trust agreement. Neither could have compelled Sarah to create the trust. Sarah alone entered into the contract with the trust company to achieve a personal purpose—the protection of herself and her children.

Chester was concerned with the voting control of the corporation and the problem arising from equal ownership by a "California family" and a "Montana family". Defendant refers to Chester's testimony that the transactions were "wrapped up in each other". McNair's explanation does not fully support defendant's construction of this phrase. He testified:

"These two transactions, by that meaning a sale of the corporation's part of its interest in the Duval Wallace building and the retirement of my brother and the exchanging of my sister's common stock for other common stock, nonvoting series 'B' were wrapped up in each other. Theretofore my brother, and my sister and I had equal stock ownership in the corporation. When these transactions were culminated my brother would not be interested at all. My sister and I would have virtually fifty per cent stock interest each in the corporation. It would be highly detrimental to the corpora-

taxpayer should have reported as her gain, the difference between her basis and the fair market value of series "B" stock, $600 per share". Would the fair market value be the same for an equitable life estate?

15. See discussion in 3 Mertens Law of Federal Income Taxation, 598 ff, § 20.161.

tion and quite probably to me and my heirs that such a situation should exist * * * The corporation would then be owned half and half by a California family and a Montana family. If there was a conflict of interests or a conflict of policy between those two ownerships, a situation could arise where the corporation would be stymied. It is conceivable it couldn't elect a board of directors or that in the event of a proposed sale of an asset it could not be agreed upon; that a normal ordinary conduct of the corporation could be curtailed to where it couldn't function properly at all, and might result in a receivership with an ensuing very bad effect on the corporation itself, as well as my sister's interest and my interest."

While the exchange of stock was to the mutual advantage of Sarah, Chester and the corporation, Sarah's purpose to protect herself and her family through creating the trust was separate and distinct from the purpose of Chester and the corporation to avoid the problems arising from divided control.

Defendant refers to the series "B" stock as "nonvoting, nontransferrable, redeemable stock, as to which stock it was understood that dividends would be paid and the stock redeemed quickly". It is true that under the amended articles of incorporation the stock was nonvoting and redeemable. The effect of exchanging voting for nonvoting stock has been considered. The provision for redemption is not essentially different from a resolution adopted on December 16, 1948, authorizing the board to purchase the old stock of the corporation.[16] Likewise with respect to the payment of dividends the situation was no different after the

exchange. Prior to the exchange Chester and B. P. McNair, Jr. on occasions waived their dividends so that Sarah might receive hers. After the exchange of stock Sarah had no greater right to dividends than she had before.

There is no provision in the amended articles of incorporation making the stock nontransferrable. In effect the new series "B" stock was transferred by Sarah to the trust. The certificate was issued to the trust at her direction. After the trust acquired the stock it was not transferrable, but that was because of the provisions of the trust agreement and not the result of any corporate action or any agreement of the stockholders.

■ It is my conclusion that Sarah exchanged common stock solely for common stock in the same corporation and that accordingly there was no taxable gain by reason of the exception contained in section 112(b) (2). Having reached this conclusion it is perhaps unnecessary to consider whether the transaction was also a tax-free exchange by reason of the exception contained in section 112(b) (3). To some extent, however, the same principles are involved.

In determining whether the stock was exchanged pursuant to a plan of reorganization within the meaning of section 112 (b) (3), two related factors must be considered: (1) whether there was a legitimate "business purpose" in the recapitalization; and (2) whether the exchange was made pursuant to a plan or reorganization or merely incidental to a plan of partial liquidation.

■ If the reorganization were merely a device to avoid the tax consequences of a partial liquidation, the exception contained in section 112(b) (3) would not be applicable.[17] On the other

16. At the stockholders' meeting held December 16, 1948, the following resolution was adopted: "Be it resolved, That the directors of this corporation be and they are hereby authorized and empowered to take all steps necessary to accomplish the purchase by the corporation of its own stock in such amounts and at such prices as they, in their discretion, may

deem desirable under any of the circumstances in which a corporation is authorized to purchase its own stock by virtue of the provisions of Chapter 39 of the Session Laws of Montana of 1947."

17. See Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Bazley v. Commissioner, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782.

**470**

hand, if the reorganization had a "business purpose" germane to the successful continuance of the business and the exchange was effected pursuant to a plan or reorganization,[18] the exchange is tax-free, even though a partial liquidation may have accompanied the reorganization.[19] The business purpose here was to avoid the problems arising from divided control through the ownership of half of the stock by a "Montana family" and the other half by a "California family".[20] While Sarah created the trust at the time of the reorganization and directed that the new stock be issued to the trustee, the reorganization was not in my opinion incidental to any plan of liquidation but rather had a legitimate business purpose of its own. Accordingly, I find that the exchange was tax-free under section 112(b) (3).

---

18. See Commissioner of Internal Revenue v. Kolb, 9 Cir., 1938, 100 F.2d 920, 926; Helvering v. Winston Bros. Co., 8 Cir., 1935, 76 F.2d 381, 383; Davis v. Penfield, 5 Cir., 1953, 205 F.2d 798.

19. See Becher v. Commissioner of Internal Revenue, 2 Cir., 1955, 221 F.2d 252.

20. See excerpt from testimony of Chester McNair, supra.