ESTATE of Moses L. PARSHELSKY, Deceased, Lawrence A. Baker, Clarence G. Bachrach, Isidore Schwartz and Abraham Parshelsky, Executors, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 9, Docket 26351.

United States Court of Appeals Second Circuit.

Argued Nov. 8, 1961.

Decided May 3, 1962.

Lawrence A. Baker, New York City (Winthrop, Stimson, Putnam & Roberts, New York City, Bachrach & Bisgyer, Brooklyn, N. Y., on the brief), for petitioners.

L. W. Post, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, and MEDINA and WATERMAN, Circuit Judges.

LUMBARD, Chief Judge.

The principal question to be decided is whether the distribution by a corporation to its sole shareholder of the shares of a newly organized subsidiary constituted a taxable dividend under § 115 (a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 115(a), or a tax-free-spin-off reorganization within § 112(b) (11) of the Code, 26 U.S.C.A. § 112(b) (11).[1] The Tax Court held that there was no business purpose for the exchange and thus the exchange was used principally as device for the distribution of earnings. 34 T.C. 946 (1960). We think that the Tax Court's inquiry into business purpose was too narrow since it evaluated only those reasons for the spin-off which benefited the corporation and ignored any valid shareholder non-tax-avoidance reasons which might be present. Consequently, we reverse and remand for further findings in accordance with the views expressed in this opinion.

## I. Facts

Moses L. Parshelsky had been for many years, until his death, sole shareholder of Parshelsky Brothers, Inc., which operated a wholesale lumber and millwork business at Meserole Street and Morgan Avenue in Brooklyn, on property which it owned. This consisted of a one-story building with 50,000 to 60,000 square feet of floor area where the corporation stored all forms of wood trim for sale to local wholesalers and builders. Parshelsky was active in the management and conduct of the business and personally handled or supervised most of the office work.

1. § 115(a) "*Distribution by Corporations.* The term 'dividend' when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property * * * [out of earnings and profits]."

§ 112(b) (11) "*Distribution of stock not in liquidation.* If there is distributed, in pursuance of a plan of reorganization, to a shareholder of a corporation which is a party to the reorganization, stock (other than preferred stock) in another corporation which is a party to the reorganization, without the surrender by such shareholder of stock, no gain to the distributee from the receipt of such stock shall be recognized unless it appears that (A) any corporation which is a party to such reorganization was not intended to continue the active conduct of a trade or business after such reorganization, or (B) the corporation whose stock is distributed was used principally as a device for the distribution of earnings and profits to the shareholders of any corporation a party to the reorganization."

§ 112(g) "*Definition of reorganization.* As used in this section * * * (1) The term 'reorganization' means * * * (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *."

The 1939 Code applies to this transaction since it took place before June 22, 1954. Internal Revenue Code of 1954, §§ 391, 393, 26 U.S.C.A. §§ 391, 393.

During the Korean War inventory was difficult to procure and the unit volume of sales declined [2] while costs increased. Due to these factors net income declined markedly.[3] By the end of the Korean conflict, the warehouse was 40% empty, and Parshelsky engaged in some discussions relevant to renting space to outsiders.

The corporation had built up its liquid assets and was improving its net asset position. Total current assets, more than one-half of which were United States Treasury notes, remained at approximately $1,400,000 from 1950 to 1954 while current liabilities fell from $181,000 to $16,000. In each of these tax years the corporation paid a tax for unreasonably accumulating its earnings.[4] Parshelsky was advised by his attorney that, notwithstanding this surtax, his high personal tax rates made it advantageous not to distribute the corporate earnings.

Because of the decline in net profits and because in 1953 he was 79 years old, Parshelsky became concerned about the disposition of the business after his death. His will provided that certain of his key employees could purchase Parshelsky Brothers' inventory, fixtures, equipment, and customer lists at favorable prices and could use the real estate at a favorable rental.[5] Although he hoped that his employees would carry on the business, he did not want his name to be connected with it.

After consultation with his attorney and his accountant Parshelsky caused a new corporation, Parshelsky Realties, Inc. (Realties), to be organized late in 1953. On January 4, 1954, Parshelsky Brothers transferred the real estate to Realties in exchange for all of the latter's capital stock which was immediately distributed to Parshelsky, the sole shareholder of Parshelsky Brothers. Simultaneously with the carrying out of this exchange, Realties leased the real estate back to Parshelsky Brothers for five years at an annual rental of $42,000 with an option to renew for an additional five years. The lease gave Parshelsky Brothers, the lessee, the right to sublease for its own account up to 50% of the floor space.

At trial Parshelsky's attorney testified that there were several reasons why Parshelsky did not want the real estate, worth $360,000, to remain in the Parshelsky Brothers' corporation. First, Parshelsky did not want the valuable real estate to remain subject to the hazards of the wholesale lumber and mill-

2. Because of inflation, gross sales and inventory in terms of dollar volume did not decline.

3. Net income before federal income taxes as reflected on Parshelsky Brothers' federal income tax return for the fiscal years ended January 31 is as follows:
   1951 ................ $135,996
   1952 ................ 81,984
   1953 ................ 63,421
   1954 ................ 30,415

4. Internal Revenue Code of 1939, § 102, 26 U.S.C.A. § 102 (substantially similar to Internal Revenue Code of 1954, §§ 531–537, 26 U.S.C.A. §§ 531–537).
   The government did not claim that the spin-off decreased this tax. See Internal Revenue Code of 1954, § 1551, 26 U.S.C.A. § 1551.

5. His will dated March 14, 1951 authorized his executors to sell to certain specified employees "any or all of the stock of trim, doors, glass and other merchandise of PARSHELSKY BROS., INC. at the cost prices thereof to PARSHELSKY BROS., INC., or for such lower or higher prices as my Executors in their uncontrolled discretion shall deem proper * * *" and "any or all of the fixtures, furniture and equipment of PARSHELSKY BROS., INC., at a nominal price, or at such higher price as my Executors in their uncontrolled discretion shall deem proper * * *" and "to give [them] * * * lists of customers of PARSHELSKY BROS., INC., and such other information as may be of use to them * * *" and "to lease [to them] said premises or any part or parts thereof * * * for a period of not more than five years, at a rental sufficient to cover the proportionate amount of the carrying charges for the premises leased and pay some return on the investment but not necessarily at the full rental which could be obtained for the leased premises from other parties."

work business. Second, he wanted to put "the operating company [Parshelsky Brothers] in a position where it had a very much better chance of survival in operation when he relieved his employees who might take over the inventory of the problem of having to deal with the building." Third, he wanted his "successor in interest to continue to own and operate * * * this real estate regardless of whether Parshelsky Brothers survived, because he believed that it ought to be a very profitable thing." Finally, he wanted the real estate to be readily available to his executors as a separate asset of his estate.

Parshelsky retained all the stock in both Parshelsky Brothers and Realties until his death on March 13, 1955. In his will he made a number of specific bequests, most of which were to miscellaneous charities; he created a trust fund with a principal of $200,000 for the benefit of his only surviving relative, his brother Abraham, for life; and he left the residue of his estate and the remainder of his brother's trust fund to charity.

Parshelsky treated the receipt of Realties' stock as a tax-free corporate reorganization under 1939 Code § 112(b) (11) and thus reported no income therefrom. The Commissioner, on the other hand, has taken the view that § 112(b) (11) does not apply because of the absence of a "business purpose," has treated the distribution of the Realties stock as a $360,000 dividend, and thus has asserted a $311,637.89 deficiency against the Estate of Moses L. Parshelsky for the calendar year 1954. Parshelsky's executors made an unrelated claim for refund of income taxes allegedly overpaid on the 1954 return. Without mentioning the refund claim, a single judge of

the Tax Court upheld the deficiency on the ground that since there was no corporate business purpose for the reorganization, the transaction was a device for the distribution of earnings and profits. 34 T.C. 946 (1960). The full Tax Court reviewed this decision without a dissent. The taxpayer appeals. Internal Revenue Code of 1954, § 7482, 26 U.S.C.A. § 7482.

We find that the distinction between corporate and shareholder benefit does not accord with the purpose of Congress in enacting § 112(b) (11). We hold that while corporate benefit is relevant to the application of the tax-free spin-off provision, shareholders' personal non-tax-avoidance reasons must also be considered.

## II. *Corporate and Shareholder Business Purpose*

Because the first provision for tax-free spin-offs did not contain restrictions like those of § 112(b) (11) (A) and (B),[6] a literal reading of the statute made it subject to abuse. By having an existing corporation transfer liquid assets to a new corporation, the stock of which would then be distributed to the existing corporation's shareholders who would liquidate the new corporation, the assets when liquidated would be taxed at capital gains rather than dividend rates. In the case of Gregory v. Helvering, 203 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), the Supreme Court held that such a scheme was not a tax-free spin-off. The Gregory case has been accepted as laying down a general principle of tax law, that in order to fit within a specified provision of the Internal Revenue Code a transaction must not only comply strictly with the explicit requirements of the section, but it must also have a "business purpose" that falls within the spirit of the section.[7]

6. Revenue Act of 1924, § 203(c).
   For the history of tax-free spin-offs, see generally, Spangler v. Commissioner, 18 T.C. 976, 987 (1952); Mintz, Divisive Corporate Reorganizations, Split-Ups and Split-Offs, 6 Tax L.Rev. 365 (1951); Bittker, Federal Income Taxation of Corporations and Shareholders 321–28 (1959);

3 Mertens, Law of Federal Income Taxation § 20.100 (1957).

7. See Michaelson, "Business Purpose" and Tax-Free Reorganization, 61 Yale L.J. 14, 25 (1952); Surrey & Warren, Federal Income Taxation 1540–1545 (1960 ed.); Rice, Judicial Techniques in Com-

Many of the earlier cases in applying the business-purpose test to reorganizations gave credence only to those non-tax-avoidance purposes which benefited the corporations involved.[8] This required a separation of the corporate reasons for the reorganization from those of the shareholders. Most of the more recent cases have rejected this approach in favor of an evaluation of all the non-tax-avoidance motives of both the corporations and shareholders involved.[9] However, the regulations apparently lend support to the so-called "corporate-benefit test." Regs. 118, § 39.112(g)–2(g).

The rationale for this distinction between corporate purposes and shareholder purposes is not explicitly elucidated in the cases which adopted it. Partly it may rest upon a misconception of the business-purpose test, that is, an assumption that the words "business purpose" have independent significance relating to the business of the corporation rather than merely being a shorthand expression for the Gregory-type statutory interpretation process. Partly, however, it probably rests upon an interpretation of early legislative history of the tax-free reorganization provisions. They were enacted because Congress thought it unwise to tax "purely paper transactions," S.Rept. No. 617, 65th Cong., 3d Sess. 5 (1918); accord, H.R.Rept. No. 1337, 83rd Cong., 2d Sess. 34 (1954), that are "merely changes in form and not in substance," H.R.Rept. No. 704, 73rd Cong., 2d Sess. 13 (1934); Statement of the Changes Made in the Revenue Act of 1921 by H.R. 6715 and the Reasons Therefor (1924)

batting Tax Avoidance, 51 Mich.L.Rev. 1021, 1043 (1953).

The taxpayer argued that the two specific provisos of § 112(b) (11), the "active business" and the "device" restrictions, have occupied the field so that the "business-purpose" method of statutory interpretation does not apply. The legislative history of the 1951 Act makes it clear that Congress was very concerned with tax evasion schemes of the Gregory type when it enacted § 112(b) (11). Representative Camp, the sponsor of the bill in the House, stated that if the bill was passed spin-offs would be "subject to the general limitations embodied in the Gregory case and subsequent decisions based thereon." 96 Cong.Rec., Part 14, 1980 (1950). Therefore, to the extent that § 112(b) (11)'s two provisos are not as broad as the judicial safeguard of statutory interpretation, Congress did not intend to shackle the courts. See American Law Institute, Federal Income, Estate and Gift Tax Project, Income Tax Problems of Corporations and Shareholders 138 (October 31, 1958) (hereinafter cited as A.L.I. 1958 Tax Project); Bittker, supra note 6, at 339–40; Michaelson, supra, at 21 n. 32. The courts have assumed that the "device" restriction requires inquiry into business purpose. See, e. g., Bondy v. Commissioner, 269 F.2d 463 (4 Cir. 1959).

8. See, e. g., Bazley v. Commissioner, 4 T.C. 897 (1945), aff'd, 155 F.2d 237, 242–43 (3 Cir. 1946) (3–2), aff'd without mentioning this issue, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782 (1947);

Adams v. Commissioner, 5 T.C. 351, 356–57 (1945) (5 dissents), aff'd, 155 F.2d 246, 247 (3 Cir. 1946) (3–2), aff'd without mentioning this issue, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782 (1947); Heady v. Commissioner, 4 C.C.H. T.C.M. Dec. 14,702 (1945), aff'd, 162 F.2d 699 (7 Cir. 1947); Bondy v. Commissioner, 269 F.2d 463 (4 Cir. 1959); Farr v. Commissioner, 24 T.C. 350, 367–69 (1955); Michaelson, supra note 7, at 31–33; Spear, "Corporate Business Purpose" in Reorganization, 3 Tax L.Rev. 225 (1947).

9. See, e. g., Lewis v. Commissioner, 176 F.2d 646, 649–50 (1 Cir. 1949), aff'g 10 T.C. 1080, 1086–88 (1948); Bazley v. Commissioner, 155 F.2d 237, 244–46 (3 Cir. 1946) (dissent), aff'd without mentioning this issue, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782 (1947); Survaunt v. Commissioner, 162 F.2d 753, 757–59 (8 Cir. 1947); cf. Easson v. Commissioner, 294 F.2d 653, 658–60 (9 Cir. 1961), reversing on other grounds, 33 T.C. 963, 971–73 (1960). See also Michaelson, supra note 7, at 31–33; Spear, supra note 8.

The fact that the meaning of business purpose in the cases cited in this footnote and footnote 8 arose in varied factual contexts, in some the Commissioner trying to tax a distribution as "essentially equivalent to a dividend" and in others the taxpayer attempting to escape tax-free, does not alter the validity of the non-tax-avoidance reasons there accepted, but merely affects their evaluation.

10, 13 (Gregg Statement),[10] and because Congress thought that normal business readjustments should not be impeded by the imposition of an income tax. See H. R.Rept. No. 179, 68th Cong., 1st Sess. 13 (1924); Sen. Rept. No. 398, 68th Cong., 1st Sess. 14–15 (1924); Statement of the Changes Made in the Revenue Act of 1921 by H.R. 6715 and the Reasons Therefor (1924) 6 (Gregg Statement). The latter statement is susceptible of the interpretation that corporate business reasons are necessary to the existence of the non-taxable reorganization. However, considered both in light of the later legislative history, and the situations in which spin-off reorganizations occur, these statements can be interpreted as admitting both corporate and shareholder non-tax-avoidance reasons.[11]

Congress enacted § 112(b) (11) so that businesses could be broken up "into a greater number of enterprises when undertaken for legitimate business purposes." Sen. Rept. No. 781, 82nd Cong., 1st Sess. 58 (1951), U.S.Code Congressional and Administrative News 1951, pp. 1969, 2029. Shortly thereafter Congressional committees reported that the tax-free treatment for reorganizations was "to provide for nonrecognition of gain or loss in cases which involve a mere rearrangement of the corporate structure or other shifts in the form of the corporate enterprise which do not involve any distribution of corporate assets to shareholders." H.R.Rept. No. 1337, 83rd Cong., 2d Sess. 34 (1954); accord, Sen. Rept. No. 1662, 83rd Cong., 2d Sess. 42 (1954), U.S.Code Congressional and Administrative News 1954, pp. 4025, 4629.

Furthermore, since most spin-offs, including the one involved in this case, concern closely-held corporations, it is not only difficult but often purely formalistic to distinguish between corporate and personal benefit.[12] The separate legal entity of corporations cannot obscure the fact that they are operated by their shareholders in the manner most likely to benefit themselves. Lewis v. Commissioner, 176 F.2d 646, 649 (1 Cir. 1949), aff'g 10 T.C. 1080, 1086 (1948); Bazley v. Commissioner, 155 F.2d 237, 245 (3 Cir. 1946) (dissent), aff'd 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782 (1947). The benefits to the corporation and to the shareholders are virtually indistinguishable. Consequently, the courts have uniformly held transactions such as reallocations of ownership interests between different groups of shareholders to be tax-free reorganizations. See e. g., Wolf Envelope Co. v. Commissioner, 17 T. C. 471 (1951), appeal dismissed, 197 F.2d 864 (6 Cir. 1952); Hartzel v. Commissioner, 40 B.T.A. 492 (1939); Carnahan v. United States, 188 F.Supp. 461, 469–70 (D.Mont. 1960).

We find, therefore, that the Tax Court erred in this case when it examined only those reasons for the reorganization "relating to the business being carried on by the corporation, or relating otherwise to the corporation's organization or functioning" and refused to examine those "arising from and serving only the personal or noncorporate-business interests of the shareholders." 34 T.C. at 951. The Tax Court thought it to be the very antithesis of acceptable business purpose for the reorganization to deprive the corporation of such a valuable asset as the real estate upon which the business was being conducted, and to burden it with an annual rental charge of $42,000. However, all spin-offs necessarily leave the original corporation with less assets than they had to begin with.

---

10. See also A. L. I. 1958 Tax Project, supra, note 7, at 203; Hellerstein, Mergers, Taxes, and Realism, 71 Harv.L.Rev. 254, 258–59 (1957).

11. See A. L. I. 1958 Tax Project, supra note 7, at 137–39, 147–49; see also Surrey, Income Tax Problems of Corporations and Shareholders: American Law Institute Tax Project—American Bar Association Committee Study on Legislature Revision, 14 Tax L.Rev. 1, 12–13 (1958).

12. See Spear, supra note 8, at 242–43; Note, Taxability of Securities Received in a Corporate Recapitalization, 43 Ill.L. Rev. 512, 517 (1948).

III. *Evaluation of the Spin-off's Corporate and Shareholder Reasons and Tax-Avoidance Probabilities*

■■ In enacting § 112(b) (11) [13] Congress meant to grant tax-free treatment to those spin-offs which were designed to serve valid non-tax-avoidance corporate or shareholder purposes but not to those which were effected for tax-avoidance. The principal likelihood of tax avoidance at the time of the spin-off was that Parshelsky might have transferred ordinary income into capital gain. Normally when a corporation distributes assets to its shareholders or sells the assets and distributes their proceeds, a dividend results and the shareholders pay ordinary income tax. However, if the corporation is permitted to transfer the assets to a new corporation and distribute the new corporation's stock to its shareholders in a tax-free spin-off, the shareholders could completely liquidate the new corporation or sell its stock, thus realizing capital gain rather than ordinary income. Because of these tax-avoidance possibilities, Congress intended to limit tax exemption to those spin-offs where the taxpayer had corporate or shareholder purposes such as would motivate a reasonable businessman to effect a spin-off. Therefore, the court must first ascertain the taxpayer's corporate and shareholder purposes and then evaluate their validity on such an objective basis.

■ Parshelsky's executors argue that one reason for the spin-off was to remove the valuable real estate from the hazards of the declining wholesale business. However, after the reorganization Parshelsky Brothers retained in excess of $750,000 in Treasury notes and cash, and the corporation's current liabilities had declined to approximately $16,000. In short, these facts lend little support to this argument of the executors. Moreover, the real estate could have been safeguarded from the creditors of the wholesale business merely by having Parshelsky Brothers transfer the wholesale business to a subsidiary corporation and retain the real estate. In light of the tax-avoidance possibilities which a spin-off often provides, there must be non-tax reasons not only for the separation of the two businesses but also for direct ownership of both by the shareholders.[14] The fact that creation of a subsidiary corporation would necessarily bring with it either the intercorporate dividend tax [15] or the additional tax on corporations filing a consolidated return is not by itself sufficient to justify split ownership at the shareholder level.[16]

A second reason advanced by the executors is that the employees who might take over the wholesale business after Parshelsky's death would not have to deal with the real estate and thus would have a better chance of survival. This might be true if employees who were to buy the stock of a corporation could not afford to pay for real estate as well as operating assets, as was the situation in Wilkins v. United States, 188 F.Supp. 91 (S.D.Ill. 1960). However, in this case the plan specifically elucidated in Parshelsky's will was to sell certain assets to the employees but not to sell the stock,[17] because Parshelsky did not want the name Parshelsky Brothers, Inc., to be carried on.

13. Section 317 of the Revenue Act of 1951, 65 Stat. 452.

14. See, e. g., Bondy v. Commissioner, 30 T.C. 1037, 1043–44 (1958), reversed on other grounds, 269 F.2d 463 (4 Cir. 1959); Riddlesberger v. Commissioner, 200 F.2d 165, 175 (7 Cir. 1952); A. L. I. 1958 Tax Project, supra note 7, at 134–35, 150; Cohen, Surrey, Tarleau, and Warren, A Technical Revision of the Federal Income Tax Treatment of Corporate Distributions to Shareholders, 52 Colum.L.Rev. 1, 44 (1952) (hereinafter cited Cohen et al.).

15. This would amount to 7.8% if the parent corporation was in the 52% bracket or 4.5% if the parent corporation was in the 30% bracket.

16. See A. L. I. 1958 Tax Project, supra note 7, at 135; Surrey, supra note 11, at 10–12.

17. See footnote 5.

Therefore, the purpose of permitting the employees to purchase the operating assets while leasing the real estate could have been accomplished by leaving all the assets in Parshelsky Brothers and permitting that corporation to act as lessor to the employees. In fact, that is the plan originally envisaged by Parshelsky's will drawn nearly three years before the spin-off was effected.[18]

The validity of the third reason, that Parshelsky wanted his successors to continue to own the real estate regardless of the fate of the wholesale business because he considered it a good investment, is minimized by the fact that Parshelsky Brothers could have retained both the real estate and the wholesale business, selling or liquidating the latter if it proved unsuccessful.

The final reason, that Parshelsky wanted the real estate to be readily available to his executors as a separate asset of his estate, has more weight. Parshelsky left his residuary estate to the Moses L. Parshelsky Foundation, a charitable institution, which would channel the assets to various charities. To the extent that Parshelsky wanted the real estate and operating business to go to different legatees, his aim appears to be within the legislative purpose of the spin-off provision.[19] In order to carry out this non-tax-avoidance purpose the ownership of the real estate and operating assets would have to be separated at the shareholder level.

The court must determine whether, in light of all the facts, this transaction falls within Congress' purpose in enacting § 112(b) (11), i. e., to grant tax-free treatment to those spin-offs the principal purpose of which was to effectuate valid corporate or shareholder non-tax-avoidance purposes but not to those the principal purpose of which was tax-avoidance.[20] Since the Tax Court held that shareholder non-tax-avoidance purposes could not be considered in determining whether a spin-off was within § 112(b) (11), it failed to evaluate all the relevant facts. We believe that such examination of the shareholders' reasons and the evaluation of their validity is the duty of the factfinder. Such evaluation "must be based ultimately on the application of the factfinding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of * * * [this examination], the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact." Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). Therefore, we remand to the Tax Court.

### IV. *Active Business Requirement*

Although the Commissioner conceded that the transaction met all "the requirements for a non-taxable reorganization except for the absence of a valid business purpose under the rule of Greg-

---

18. Ibid.

19. If the stock in the single pre-spin-off corporation had been left to two legatees, they could accomplish the same result by separating the real estate and operating businesses into two corporations, each legatee taking one corporation tax free. See, e. g., Murrin v. Commissioner, 24 T.C. 502 (1955); Spangler v. Commissioner, 18 T.C. 976 (1952); Coady v. Commissioner, 33 T.C. 771 (1960), aff'd per curiam, 289 F.2d 490 (6 Cir. 1961).
Cf. Cohen et al., supra note 14, at 13.

20. Although many opinions, including this court's and the Supreme Court's Gregory opinions purport to ignore any tax-avoidance motives, it is evident that they did take cognizance of them in evaluating the validity of the taxpayer's asserted "business purpose." See Rice, supra note 7, at 1033-38; Spear, supra note 8, at 244; Bittker, supra note 6, at 15. See also Commissioner v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945); Weller v. Commissioner, 270 F.2d 294 (3 Cir. 1959), cert. den., 364 U.S. 908, 81 S.Ct. 269, 5 L.Ed.2d 223 (1960); Diggs v. Commissioner, 281 F.2d 326 (2 Cir. 1960).

ory v. Helvering," 34 T.C. at 950, the Tax Court appeared to place some reliance upon its finding that Realties "was not intended to engage in the active conduct of any separate related business such as in the example given in the Commissioner's regulations." 34 T.C. at 953. This finding apparently refers to § 112(b)(11)(A) which requires that each corporate party to the reorganization was intended to continue "the active conduct of a trade or business after such reorganization." We think that on remand the Tax Court should reconsider this finding.

■ Probably the Tax Court's view of what constitutes an active business for § 112(b)(11) is colored by the successor provision, § 355 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 355. The regulations under § 355, provide that the active conduct of a trade or business does not include "the ownership and operation of land or buildings all or substantially all of which are used and occupied by the owner in the operation of a trade or business." Treas. Reg. 1.355–1(c)(2); see also Treas. Reg. 1.355–1(d)(2). However, § 355 of the 1954 Code departs radically from § 112(b)(11) of the 1939 Code in many respects. That they may use the term "active conduct of a trade or business" with different shades of emphasis is clear beyond challenge.[21] The regulations under § 112(b)(11) do not include the limitations of the § 355 regulations. See Treas. Reg. 118, § 39.112(b)(11). It is clear that acting as lessor of real property which is rented to others can constitute a trade or business. E. g., Pinchot v. Commissioner, 113 F.2d 718 (2 Cir. 1940); Gilford v. Commissioner, 201 F.2d 735 (2 Cir. 1953); Lagriede v. Commissioner, 23 T.C. 508 (1954); Elek v. Commissioner, 30 T.C. 731 (1958). Absent the limitations of the § 355 regulations, acting as lessor to a related corporation can also constitute an active trade or business within the meaning of § 112(b)(11). See Wilkins v. United States, 188 F.Supp. 91 (S.D.Ill.1960); Bondy v. Commissioner, 269 F.2d 463, 465 (4 Cir. 1959).

### V. *Refund Claim*

Petitioners made a claim for refund of 1954 taxes which they assert were overpaid. Parshelsky's 1954 individual return showed a tax payable of $27,513.01. There were total credits against that tax of $36,500, consisting of tax withheld and payments on his 1954 declaration of estimated tax. The 1954 return requested that the excess payments of $9,210.55 be applied to the tax liability due on Parshelsky's 1955 return. His executors filed an income tax return for the period January 1 to March 13, 1955, the date of his death, showing a tax payable of $3,549.16. This left $5,661.39 of the 1954 overpayment still unused, and for this amount Parshelsky's executors made a claim for refund. In his opening statement petitioner's counsel asked the Tax Court to accept a stipulation from the parties that the 1955 return was to be received and considered, and the parties then filed such a stipulation. The Tax Court neither mentioned the claim for refund in its opinion nor credited the overpayment against the deficiency it found. The government now contends that the stipulation for introduction of the 1955 return was not sufficient proof of the payment and the credits and that the alleged overpayment could better be handled administratively.

■ The Internal Revenue Code specifically gives the Tax Court jurisdiction to determine an overpayment. Internal Revenue Code of 1954, § 6512(b), 26 U.S.C.A. § 6512(b), Internal Revenue Code of 1939, § 322(d), 26 U.S.C.A. § 322(d). Once the taxpayer has gone through the prescribed administrative procedures, Treas. Regs. §§ 601.103, 601.105, 601.106, without reaching a settlement, the Tax Court cannot refuse to exercise this jurisdiction merely because the Internal Revenue Service still favors administrative settlement. See Schmidt v. Commissioner, 272 F.2d 423 (9 Cir.

---

21. See 3 Mertens, Federal Income Taxation § 20.103, p. 458.

1959); Keefe v. Commissioner, 15 T.C. 947 (1950). On remand, if the parties still have not reached a solution to their differences, the Tax Court should determine whether the petitioner is entitled to a refund or a credit against a deficiency, if any.

The decision of the Tax Court is reversed and remanded for further proceedings not inconsistent with this opinion.